**2013-1321**
**(Serial No. 12/589,961)**

# United States Court of Appeals
# for the Federal Circuit

IN RE SUK KAN OH
(Real Party in Interest Zinus Inc.)

*Appeal from the United States Patent and Trademark Office,*
*Patent Trial and Appeal Board.*

## BRIEF FOR APPELLANT

DARIEN K. WALLACE
T. LESTER WALLACE
IMPERIUM PATENT WORKS LLP
315 Ray Street
Pleasanton, CA 94566
(925) 550-5067
darien@imperiumpw.com
lester@imperiumpw.com

*Attorneys for Appellant*
*Zinus, Inc.*

June 10, 2013

# CERTIFICATE OF INTEREST

Counsel for the Appellant Zinus, Inc., certifies the following:

1.  The full name of every party or *amicus curiae* represented by me is:
Zinus Inc.

2.  The name of the real party in interest represented by me is:
Zinus Inc., a California corporation.

3.  All parent corporations and any publicly held companies that own 10
percent or more of the stock of the party or *amicus curiae* represented by me
are:
Zinus, Inc., a company organized under the laws of the Republic of Korea.

4.  The names of all law firms and the partners or associates that appeared
for the party or amicus now represented by me in the trial court or agency, or
are expected to appear in this Court are:

Darien K. Wallace, USPTO Reg. No. 53,736

T. Lester Wallace, USPTO Reg. No. 34,748

IMPERIUM PATENT WORKS LLP


June 10, 2013                          /s/ Darien K. Wallace

i

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS............................................................................ ii

TABLE OF AUTHORITIES ..................................................................... iv

STATEMENT OF RELATED CASES ........................................................ v

STATEMENT OF JURISDICTION .......................................................... 1

I.   STATEMENT OF THE ISSUES .................................................... 2

II.  STATEMENT OF THE CASE ........................................................ 2

III. STATEMENT OF THE FACTS....................................................... 3

     A. The Invention ......................................................................... 3

     B. The Cited Okamoto Prior Art................................................. 5

     C. Prosecution History................................................................ 8

IV. SUMMARY OF THE ARGUMENT................................................ 12

V.  ARGUMENT ................................................................................... 14

     A. Standard of Review................................................................. 14

     B. The Board's finding that the fibrous mesh of Okamoto's
        polyurethane foam could be used as a mattress is factually
        incorrect and unsupported by any evidence .................................. 15

        1. The Board's implicit conclusion that the foam
           mentioned in Okamoto has the same structure as
           memory foam is not supported by evidence......................... 16

        2. The Board's finding that Okamoto is not limited to
           forming filaments and meshes through which water can
           flow freely is unsupported by the reference itself ............... 18

        3. The Board's finding that "molded articles" can be used
           to make a memory foam mattress is factually incorrect
           because memory foam is not reticulated foam ..................... 24

     C. The Board Committed Legal Error Under *Graham v. John
        Deere* in Affirming the Examiner's Rejection of the Claims ....... 27

VI.  CONCLUSION ..................................................................................... 29

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                   <u>Page(s)</u>

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966)...............................................................2, 14, 27, 28, 29

*In re Abbott Diabetes Care Inc.*,
   696 F.3d 1142 (Fed. Cir. 2012) ........................................................ 14

*In re Applied Materials, Inc.*,
   692 F.3d 1289 (Fed. Cir. 2012) ................................................... 14, 28

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ................................................... 14, 28

*In re Huston*,
   308 F.3d 1267 (Fed. Cir. 2002) ........................................................ 14

*In re Kotzab*,
   217 F.3d 1365 (Fed. Cir. 2000) ........................................................ 14

*In re Lee*,
   277 F.3d 1338 (Fed. Cir. 2002) ................................................... 14, 28

*In re Lueders*,
   111 F.3d 1569 (Fed. Cir. 1997) ........................................................ 14


**Statutes and Rules**

28 U.S.C. § 1295(a)(4)................................................................................... 1

35 U.S.C. § 103 ............................................................................................ 3

35 U.S.C. § 103(a) .................................................................................... 2, 9

35 U.S.C. § 134 ............................................................................................ 1

35 U.S.C. § 141 ............................................................................................ 1

35 U.S.C. § 142 ............................................................................................ 1

37 C.F.R. § 1.304 ......................................................................................... 1

## STATEMENT OF RELATED CASES

Counsel knows of no case pending in this Court or in any other court that will directly affect, or will be directly affected by, this Court's decision in the pending appeal.

# STATEMENT OF JURISDICTION

(a) This case involves an appeal from the final decision of the Patent Trial and Appeal Board (the "Board") in *Ex parte Suk Kan Oh*, Appeal number 2011-010635, decided on January 4, 2013. The statutory basis for jurisdiction of the Board from an appeal by a patent applicant from the final rejection of an examiner of the U.S. Patent and Trademark Office is 35 U.S.C. § 134.

(b) The statutory basis for jurisdiction of this Court to hear this appeal is 35 U.S.C. § 141 and 28 U.S.C. § 1295(a)(4).

(c) The Appellant filed a timely notice of appeal from the Board to this Court in compliance with 37 C.F.R. § 1.304 and 35 U.S.C. § 142 on February 15, 2013.

# I.     STATEMENT OF THE ISSUES

1.  Whether the Board erred in affirming the Examiner's rejection of claims 21-27 and 31-41 under 35 U.S.C. § 103(a) over U.S. Patent No. 6,869,681 to Okamoto et al. ("Okamoto") in view of various other prior art references.  In particular, the issue is whether the Board committed factual error by finding that Okamoto teaches adding green tea to the type of polyurethane foam that can be used to make a memory foam mattress.

2.  Whether the Board committed legal error in affirming the Examiner's rejection of claims 21-27 and 31-41 by failing properly to perform the factual inquiry into the scope and content of the prior art, as required by *Graham v. John Deere Co.*, 383 U.S. 1 (1966).

# II.     STATEMENT OF THE CASE

This case involves an application for a patent that stands rejected on grounds of obviousness, and the case comes to this Court as an appeal from the Board.  The invention described in the application is using green tea to make a foam layer of a mattress.  During the application's prosecution, the Examiner found no prior art reference that teaches using green tea to make a foam layer of a mattress.  Instead, the Examiner asserted that a prior art reference (Okamoto) that teaches green tea and mentions the words "polyurethane foam" must be referring to the type of foam that can be used

to make a foam layer of a mattress.  The Examiner had no basis or substantial evidence for making this factually incorrect assertion.  The Appellant therefore appealed to the Board (then the Board of Patent Appeals and Interferences).  The Board affirmed the Examiner's rejection of claims 21-27 and 31-41 and simply parroted the Examiner's factually incorrect assertion without relying on any evidence and without providing any reasoning as to why the "polyurethane foam" mentioned in Okamoto could be used to make the foam layer of a mattress.  In fact, the "polyurethane foam" mentioned in Okamoto could not have been used to make a memory foam mattress because the foam of Okamoto is entirely open-celled (reticulated) foam that is used to make filters through which air and water flow easily.  The Appellant now appeals to this Court seeking reversal of the Board's affirmance of the 35 U.S.C. §103 rejection of claims 21-27 and 31-41 of the patent application.

## III.    STATEMENT OF THE FACTS

### A.    The Invention

There are two independent claims at issue, independent claims 21 and 32.  Independent claims 21 and 32 are directed to methods of making a layer of a mattress using green tea foam.  Independent claim 21 includes a first step in which polyol raw materials, used to make foam, are mixed together.

3

A12, ¶0019; A22 at FIG. 1.  In one embodiment, a memory foam polyol, the polyol for polyurethane, and a polymer polyol are mixed together in the volumetric ratio of 2:1:1 for about 30 minutes.  In a second step, green dye is added to the raw materials mixed together in the first step.  A13, ¶0020.  In a third step, green tea is added to the polyol raw materials mixed together in the first step and the green dye. A14, ¶0024.  The mixture is agitated for about an additional thirty minutes.  In one embodiment, green tea powder in an amount of 0.1% of the total weight of the prior mixture is added.  In another embodiment, instead of green tea powder, a green tea water solution is added to the prior mixture.  In a fourth step, a catalyst is added to the polyol raw materials, the green tea dye, and the green tea to make a "green tea foam." A14, ¶0025.  For example, the catalyst isocyanate is added to the green tea mixture of the third step.  Isocyanate in the presence of water begins the reaction that forms polyolurethane foam from the mixture of the third step.  Water is then added to the green tea polyol mixture and the isocyanate.  Although the green tea foam forms within about three minutes, it takes about 24 hours for all of the molecules of the raw materials to undergo the chemical reaction.  In a fifth step, a top foam layer of a mattress is made using the "green tea foam." A16, ¶¶0030, 0032; A24 at FIG. 4.  The

green tea in the top foam layer acts as an antiodorant such that less of the chemical smell of the memory foam is perceived by the user.

Independent claim 32 includes a first step in which the polyol raw materials that are used to make memory foam are mixed together with green tea dye and green tea. In one embodiment, a memory foam polyol, the polyol for polyurethane, and a polymer polyol are mixed together in the volumetric ratio of 2:1:1 for about 30 minutes. A12, ¶0019. Green dye is added to the mixed polyol raw materials. A13, ¶0020. Green tea is added to the mixed polyol raw materials and green dye. A14, ¶0024. The mixture of memory foam raw materials, green tea dye, and green tea is agitated for about an additional thirty minutes. A12, ¶0019. In the next step, a catalyst is added to the polyol raw materials, the green tea dye, and the green tea to make a "green tea foam." A14, ¶0025. In the final step, the "green tea memory foam" is used to make a layer of a memory foam mattress. A16, ¶¶0030, 0032; A24 at FIG. 4.

## B.    The Cited Okamoto Prior Art

The primary reference that is the basis for all of the rejections of the claims is Okamoto et al. (U.S. Pat. No. 6,869,681). Okamoto describes making articles, such as filters, from a non-woven fabric, where the material of the non-woven fabric is impregnated with a functional component (A)

that includes a tea extract. Okamoto teaches a method for preventing flocculation (clumping) of "composite particles" formed from the tea extract (A), a ceramic component (C), and a tubular mineral component such as talc (T). The composite particles are then mixed with a resin (R). By preventing flocculation, the size of the composite particles in the resin is regulated such that the particles are not so large as to degrade the functional qualities of the tea extract (A) in the ultimate article, but yet not so small so that the tea extract (A) washes out (elutes) when water flows through the ultimate article. The mixture of composite particles and resin is then extruded to make what are referred to as "moldings." A "molding," as the term is used in Okamoto, is not something that sets up in a mold, but rather is a long and narrow extruded object, such as a filament or a film. Okamoto explains how crossover points of such "moldings" are then fused together with heat to form an article, such as a non-woven fabric.

Okamoto sets forth seventeen examples of how to prevent excessive flocculation in order to regulate the size of the composite particles present in the extruded fiber moldings. Once the moldings are made, they are then formed into non-woven fabrics. A185, col. 16:62; A186, col. 17:5, 14, 45; A187, col. 20:43, 55, 66; A189, col. 23:2. None of the seventeen examples has anything to do with foam.

In addition to Examples 1-17 that involve moldings, Okamoto also describes an Example 18 that does not involve moldings.  In Example 18, the composite particles are mixed with polyurethane raw materials, and a "polyurethane foam" is then made.  The composite particles are embedded in the resulting foam.  Okamoto states at lines 44-47 of column 23 that "the thus obtained polyurethane foam" is suitable as a filter.  Okamoto states:

> "[T]he same procedures as in Method 1 as described above were followed to obtain composite particles comprising the functional component (A) having the ceramics component (C) and the finely divided tabular mineral (T) supported thereon.  . . .  As the resin (R), a polyurethane raw material composed of a polyol component and a polyisocyanate component was prepared. Further, a silicone anti-foaming agent, a catalyst, and a foaming agent (water) were prepared as aids. The composite particles as obtained above were formulated in an amount of 7% in the side of the polyol component, and expanded polyurethane (<u>polyurethane foam</u>) <u>was then obtained</u> in the customary manner.
> <u>The thus obtained polyurethane foam</u> was good in antimicrobial properties and deodorizing properties and agreeable to the touch. Accordingly, it <u>is suitable as</u>, for example, a cosmetic puff and <u>a filter</u>." (emphasis added) A189, col. 23:29-49.

Unlike Examples 1-17, Example 18 does not involve "moldings."  Because nothing is extruded, no moldings are made.  The open-celled foam of Example 18, however, does resemble the non-woven fabrics in Examples 1-17 in that both the foam in Example 18 and the non-woven fabrics of Examples 1-17 can be used as a filter because water can flow freely through both the non-woven fabrics (of Examples 1-17) and through the foam (of

Example 18) that "is suitable as . . . a filter." The "problem" (A178, col. 2:48) Okamoto mentions of the tea extract component being washed out of the material when water flows through the material therefore applies to all of Okamoto's examples.

In a paragraph in column 13, Okamoto gives a long list of examples for which "the molding (including composite molding) or its secondary products . . . are applied". This long list includes filters and clothing materials and a host of other objects, as well as what Okamoto refers to as "bedding-related materials." A184, col. 13:41-42. The passage from column 13, however, relates only to moldings and not to the foam mentioned in Example 18. Thus, the passage from column 13 does not teach that bedding-related materials can be made from the foam mentioned in Example 18.

## C.    Prosecution History

The application in dispute, application serial no. 12/589,961 ("the '961 application"), includes the two independent method claims 21 and 32. Both independent claims recite adding green tea to polyol raw materials in order to make a green tea foam, and then using the green tea foam to make a mattress layer. In a final Office action dated November 23, 2010, the Examiner finally rejected all of the claims with obviousness rejections under

35 U.S.C. § 103(a).  Each of the obviousness rejections relies on the prior art reference Okamoto to teach the claim limitation of adding green tea to polyol raw materials in order to make green tea foam for a mattress.  In the Office action, the Examiner does not contend that Okamoto teaches a mattress.  Rather, the Examiner argues that Okamoto suggests using green tea foam to make a mattress because Okamoto teaches green tea and mentions both "bedding-related materials" and "polyurethane foam."  A74, ll. 12-14.  The Examiner relies on the secondary reference Lin et al. (U.S. Pat. App. Pub. No. 2007/0032561) for teachings polyurethane memory foam used in mattresses and pillows.  Thus, all of the rejections of the claims are also based on Lin's teaching of memory foam used in a mattress.

Although the "bedding-related materials" and the "polyurethane foam" disclosed in Okamoto are unrelated to one another, the Examiner nonetheless repeatedly refers to the fabricated concept of "foamed molding." A74, line 5; A75, line 8; A79, ll. 19, 21; A80, line 14; A81, ll. 1, 3, 5, 9; A83, line 8; A84, line 6; A85, line 16.  Okamoto does not mention a "foamed molding" because there is no such thing as a "foamed molding."  The moldings of Okamoto are long pieces of extruded plastic, whereas the fibrous mesh for a filter in Example 18 is formed through a foaming process. Foaming cannot produce a molding, and extruding cannot produce a foam.

Yet the Examiner incorrectly concluded that Okamoto's moldings include polyurethane foam because the molded articles are inherently and structurally identical to memory foam. *See* A82, line 13; A74, ll. 11-12; A75, line 10.

The applicant Suk Kan Oh appealed the Examiner's final rejection. In an appeal brief dated February 14, 2011, the applicant contested the Examiner's assertion that Okamoto teaches green tea foam that can be used in a mattress. The applicant pointed out that the "bedding-related <u>materials</u>" mentioned in Okamoto relate to washable <u>fabrics</u> made of molded fibers and filaments, referred to as "moldings" in Okamoto. The fibers and filaments (moldings) taught by Okamoto are used to make materials and fabrics that are frequently washed or that come into contact with water, such as filters, clothing, bedding fabrics and toiletry goods. The entire teachings of Okamoto relate to inhibiting the elution of the functional component (A) (such as green tea) when the moldings (fibers or filaments) are washed or are brought into contact with water. Thus, the mention of "polyurethane" in Okamoto clearly relates to foam suitable for making a breathable and washable mesh, and cannot relate to closed-cell foam usable to make a mattress. The moldings (fibers and filaments) of Okamoto are unsuited for

making the foam of a mattress.  Tellingly, Okamoto does not mention mattresses.

In a terse 6-page decision, the Board affirmed the Examiner's erroneous findings without substantial evidence, and without articulating any analysis that would permit the Board's line of reasoning to be discerned. For example, the Board provided no support or reasoning for finding that "Okamoto is not limited to forming filaments, but teaches forming a wide range of molded articles including polyurethane foam articles."  A6, ll. 17-18.  The Board did not analyze Okamoto sufficiently to recognize that molded articles cannot include foamed articles.  But the Board seems to agree that filaments, mesh and non-woven fabric cannot be used as a layer of a mattress.  Instead, the Board states that "foam articles" are a category of molded articles in addition to filaments, thus adopting the Examiner's incorrect, fabricated concept of a "foamed molding." A6, ll. 17-18.  The Board implies that Okamoto's polyurethane foam is a type of molded article that has the same structure as the polyurethane memory foam of Lin and therefore is capable of being used as a layer of a mattress.  The Board's finding that Okamoto teaches a foam having a structure capable of being used as a layer of a mattress is not supported by substantial evidence and is factually incorrect.

## IV.    SUMMARY OF THE ARGUMENT

This Court should reverse the Board's decision to affirm the 35 U.S.C. § 103 rejections of claims 21-27 and 31-41.

The Board's decision is based on a factually incorrect finding regarding what the primary reference, Okamoto, discloses.  The Board erred in finding that the polyurethane foam filter and cosmetic puff in Example 18 of Okamoto are not made of fibrous mesh, but rather are made of the type of closed-cell foam having a structure capable of being used as a layer of a mattress. *See* A6, line 17.  The Board's finding that the filter and cosmetic puff in Example 18 of Okamoto are made of the same type of polyurethane memory foam as the mattresses, pillows and cushions of Lin is not based on any substantial evidence. *See* A5, ll. 16-21.  One of ordinary skill in the art of making mattresses, when presented with the disclosure of Okamoto, would have known that the polyurethane foam of Okamoto's filter and cosmetic puff is an entirely open-celled, reticulated foam because closed-celled foam would not be water-permeable and would not accomplish Okamoto's purpose in a filter.  One of ordinary skill in the art of making mattresses would have recognized that Okamoto's foam is an entirely open-celled foam because Okamoto's central teaching relates to preventing the elution of Okamoto's functional component (green tea) when Okamoto's

washable material comes in contact with water.  One of ordinary skill in the art would have known, from a simple reading of the Okamoto document, that Okamoto does not disclose any closed-cell foam of the type suitable for making a mattress.  The statement to the contrary by the Board is just argument from lay Patent Office personnel and is without substantial evidence.

Not only is the Board's finding that Okamoto discloses a foam suitable for making a mattress factually incorrect, but the Board also failed to articulate any explanation of how it came to make its conclusion.  The Board's failure to do so makes it difficult to identify where the Board went wrong in its thinking.  The Board's 6-page decision includes no analysis whatsoever that would permit a reviewing court to discern why the Board incorrectly concluded that the polyurethane foam of Okamoto's filter and cosmetic puff are structurally identical to memory foam that is capable of being used as a layer of a mattress.  Accordingly, this Court should reverse the Board and find, as a matter of law, that claims 21-27 and 31-41 are not unpatentable based on the teachings of Okamoto.

## V.     ARGUMENT

### A. *Standard of Review*

Obviousness is a question of law based on the underlying factual findings. *Graham*, 383 U.S. at 17-18. The factual findings upon which the Board relied are to be reviewed based on substantial evidence. *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000). Those reviewable factual findings include: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the art; and (4) any objective considerations of nonobviousness. *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1148 (Fed. Cir. 2012); *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000); *In re Lueders*, 111 F.3d 1569, 1571 (Fed. Cir. 1997). The Board's decision must be supported by <u>more than a scintilla of evidence</u> such that a reasonable mind might accept the evidence as adequate. *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012); *In re Huston*, 308 F.3d 1267, 1280-81 (Fed. Cir. 2002); *In re Kotzab*, 217 F.3d at 1369.

The Board's decision must be reviewed on the grounds upon which the Board actually relied. *Applied Materials*, 692 F.3d at 1294; *In re Lee*, 277 F.3d 1338, 1345-46 (Fed. Cir. 2002). Thus, the required support for the Board's findings must be discernable from the Board's decision.

**B.  *The Board's finding that the fibrous mesh of Okamoto's polyurethane foam could be used as a mattress is factually incorrect and unsupported by any evidence.***

All dependent claims of the '961 application depend from independent claims 21 or 32.  Independent claims 21 and 32 recite (emphasis added):

> 21.  A method comprising:
>      (a) mixing polyol raw materials together, wherein the polyol raw materials are used to make foam;
>      (b) adding green dye to the polyol raw materials mixed together in (a);
>      (c) <u>adding green tea</u> to the polyol raw materials mixed together in (a);
>      (d) adding a catalyst to the polyol raw materials, the green tea dye and the green tea <u>to make a green tea foam</u>; and
>      (e) <u>making a foam layer of a mattress using the green tea foam</u>.
>
> 32.  A method comprising:
>      (a) mixing together polyol raw materials, green tea dye and green tea, wherein the polyol raw materials are used to make memory foam;
>      (b) <u>adding</u> a catalyst to the polyol raw materials, the green tea dye and the <u>green tea to make a green tea foam</u>; and
>      (c) <u>using the green tea foam to make</u> a green-colored top <u>layer of a memory foam mattress</u>.

Both claims 21 and 32 essentially recite adding green tea to make "a green tea foam" and using "the green tea foam" to make a foam layer of a mattress.  The Board affirmed the examiner's finding that Okamoto teaches a "green tea molding composition" capable of being used to form a foam layer of a mattress.  A6, ll. 5-8.  Thus, the Board found that the "green tea molding

15

composition" of Okamoto teaches the recited green tea foam that is capable of being used as a layer of a mattress.  A5, ll. 11-12.

1.    **The Board's implicit conclusion that the foam mentioned in Okamoto has the same structure as memory foam is not supported by evidence.**

There was no substantial evidence to support the finding that led the Board to conclude that independent claims 21 and 31 are obvious in light of the teachings of Okamoto and Lin.  Specifically, there was no substantial evidence to support the Board's finding that the green tea composite moldings of Okamoto could be formed into a foam layer capable of being used as a layer of a mattress.  Not only did the Board fail to support its finding with substantial evidence, but the Board also failed to present analysis that would allow the Board's reasoning to be discerned.  The Board incorrectly concludes that "Okamoto is not limited to forming filaments, but teaches forming a wide range of molded articles including polyurethane foam articles."  A6, ll. 18-19.  The Board does not state why it concludes that some of the "molded articles" of Okamoto are not made of filaments, or why the polyurethane foam filter and cosmetic puff mentioned in Example 18 of Okamoto are not formed from a fibrous mesh or filaments.  *See* A189, col. 23:46-49.  Okamoto does not even mention any "molded articles" or

"molding composition" referred to by the Board, and the foam in Example 18 is not a molding.

The Board provides no reasoning as to why it finds that the polyurethane foam mesh of Okamoto that is suitable for making a filter and cosmetic puff would also be suitable for making a layer of a mattress. A5, ll. 16-18.  The Board provides no rationale as to why it finds that polyurethane foam that can be used to make a mattress falls within the type of "molded articles" described in Okamoto.  A6, line 18.  Although the Board provides no rationale for these findings, the Board's determination that Okamoto's polyurethane foam mesh (which is suitable for making filters and cosmetic puffs) would also be suitable for making a mattress is probably based on the unstated premise that Okamoto's use of the term "polyurethane foam" refers to the most common type of closed-cell polyurethane foam, as opposed to the open-celled, reticulated foam mesh of Okamoto's Example 18.  This premise was incorrect.  In the entire Okamoto reference, the words "polyurethane foam" are used just twice.  A189, col. 23:44,46.  Even though the entire teachings of Okamoto relate to filaments, fibers and meshes, the Board incorrectly assumed that the polyurethane foam mesh of Okamoto has the same structure as the more common type of polyurethane memory foam described in Lin.  A decision based on an incorrect meaning of the twice-

used word "foam" in a reference that relates entirely to filaments, fibers and meshes is not supported by more than a scintilla of evidence.

Giving a word an incorrect meaning that is contrary to the gist of the remaining twelve thousand words of a reference does not constitute factual evidence. The Examiner may not pick and choose an isolated statement out of a reference and interpret that statement in a particular way to the exclusion of the overall teachings of the reference. Based on the entirety of Okamoto's disclosure, there is not such relevant evidence as a reasonable mind might accept as adequate to support the conclusion that twice using the words "polyurethane foam" somehow discloses a structure different than the water-permeable filament and mesh structures described by the remainder of Okamoto's disclosure. The Board's decision, based on an incorrect implicit conclusion, lacks the necessary substantial evidence to support a rejection of the claims.

> **2.    The Board's finding that Okamoto's "molding composition" can be used to make a mattress is unsupported by the reference.**

The Board's finding that the polyurethane foam mesh of Okamoto that is suitable for making a filter and cosmetic puff would also be suitable for making a layer of a mattress is unsupported by the Okamoto reference itself. The Board incorrectly concluded that "Okamoto is <u>not limited to</u>

forming <u>filaments</u>, <u>but teaches</u> forming a wide <u>range of molded articles</u>

including polyurethane foam articles" (emphasis added).  A6, ll. 17-18.

With one exception that is unrelated to foam, Okamoto is limited to forming

filaments and fibers.  Moreover, the "moldings" of Okamoto do not

encompass polyurethane memory foam.

As explained in the background section of Okamoto, the inventors

advanced prior technologies for making air filters out of

molded <u>polypropylene filaments and fibers</u> impregnated with a tea extract

that form a non-woven fabric.  *See* A178, col. 1:18, 28-29.  The closest prior

art were three published Japanese patent applications relating to filters made

of polypropylene filaments impregnated with a bactericide or a virus-

inactivating agent.  *See* Japanese Patent Laid-Open No. 99656/1989 to

Tashiro Yoshikazu, A232-A235; Japanese Patent Laid-Open No.

148407/1995 to Yoshikazu et al., A236-A257, and Japanese Patent Laid-

Open No. 266828/1996 to Kasuo et al., A258-A277.  In Yoshikazu et al. and

Kasuo et al., the virus-inactivating agent was the tea-extraction component

(A), which was impregnated into the polypropylene fibers of a non-woven

fabric (B).  Okamoto improves upon the work of Yoshikazu et al. and Kasuo

et al. and in some embodiments <u>substitutes polyurethane filaments for</u>

<u>polypropylene filaments</u>.  The reference to "polyurethane foam" in Example

18 of Okamoto refers to a fibrous mesh of polyurethane in the form of reticulated foam. *See* A189, col. 23:44,46. Okamoto has nothing to do with closed-cell polyurethane foam of a type usable to make a mattress. The only foam disclosed by Okamoto is a "foam" suitable to make a filter, and more particularly, to an open-celled foam that water can flow through without eluting the tea-extraction component (A) out of the filter.

Perhaps the Board's incorrect finding that Okamoto is not limited to forming filaments partly results from incorrectly assuming that the terms "molded" and "molding" are used in Okamoto with their customary meanings. The Board refers to Okamoto's "green tea <u>molding composition</u>" and "<u>molded articles</u> including polyurethane foam articles." A6, ll. 7, 18. But the word "molded" is not used in Okamoto, and the terms "molding composition" and "molded articles" also do not appear anywhere in Okamoto. (Okamoto refers to the "resin composition.") Okamoto does not use the term "molding" to refer to a structure that sets up in a mold. Instead, Okamoto uses the term "molding" to refer to an extruded filament or film. For example, a "composite molding" is a composite core-sheath filament with an internal component (X) making up the core and an external component (Y) making up the sheath. A178, col. 2:33; A183, col. 11:30-37; A184, col. 13:14-15; A185, col. 16:60-61; A187, col. 20:41-42. A molding

can be in: (i) a filament state; (ii) a film or sheet state; (iii) a net-like state; or (iv) a container state.  A183, cols. 11:67, 12:2-11, 39-43; A184, col. 13:15,29-30.  A molding in a film or sheet state is then slit into thin strips to form filaments.  A183, col. 12:8.  Moldings initially extruded in both the linear filament state and the sheet-like state can later be formed into a net-like state by using rotating dies. A183, col. 12:39-43.  The net-like state resembles a mesh or a non-woven fabric.  A184, col. 13:57.  The net-like state can also be achieved using a foaming agent.  A189, col. 23:41.  However, the fibers formed through foaming are not formed through molding (extrusion).

The term "molding" in Okamoto is not used to convey the most common English meaning.  For example, the second Japanese reference cited in the background section of Okamoto states, "it <u>molds and cuts into film state</u> and nonwoven fabric-ization is performed. This nonwoven <u>fabric is molded</u> into a filter . . ." (emphasis added).  A240, ll. 21-23.  Fabric cannot be "molded" in the same way that polyurethane memory foam is molded.  Again, the term "molding" in Okamoto does not refer to raw materials being poured into a mold and then setting up.  Yet the Board's finding that the mesh filter and cosmetic puff of Okamoto have the same structure as polyurethane memory foam is based on the implicit conclusion

that the term "molding" in Okamoto refers to foam raw materials that set up in a mold. This finding by the Board was in error. To the contrary, the term "molding" refers to an extrusion having a long, narrow surface with a uniform cross-section over its full length, which describes extruded filaments and films of a type usable to make washable fabrics and meshes. The Board erred by misinterpreting the term "molding."

The one exception to Okamoto's moldings being filaments is the so-called "container state." A molding in the container state takes the shape of various parts, such as a container or a plate. A183, col. 12:9-11; A184, col. 13:28-31. The container state is not described in detail in Okamoto, but a molding in the container state appears to be solid plastic. But such a molding is an extruded object, and is never closed-cell foam. The "polyurethane foam" referred to in Example 18 of Okamoto is reticulated, open-celled foam, which is a fibrous mesh in the net-like state. Okamoto teaches how to attach particles of the functional component (A) (e.g., tea catechin) to the filaments in the appropriate size so that the functional component does not elute out of the filaments and retains its functional properties as water or air flow over the filaments and through the non-woven fabric or mesh. Water and air cannot flow through closed-cell foam. The inventors in Okamoto noticed that when the particle size of the functional

component was too large, the "moldability" (ability to extrude through a small hole) of the filaments was adversely affected and the properties of the functional component were not sufficiently exhibited. A178, col. 2:43-48. But when the particle size of the tea extract attached to the filaments was too small, the tea extract washed away (eluted) when the filters were washed with water. A181, col. 8:19-25. Washing with water is never a consideration with closed-cell foam because water cannot pass through the closed cells. Thus, Okamoto teaches in Example 18 how to include tea catechin with the appropriate particle size in the fibrous mesh of the reticulated polyurethane foam of a filter or a cosmetic puff so that the tea catechin does not elute out, but retains its anti-microbial and deodorizing properties as water flows through the fibrous mesh. A189, col. 23:46-49. Example 18 of Okamoto does not relate to the type of closed-cell foam that has a structure capable of being used as a layer of a mattress. In a closed-cell foam, the closed cells enclose air pockets that provide enough resiliency to support a body lying on a mattress made of the closed-cell foam. Clearly, Okamoto's teaching about preventing elution during washing is not a teaching relating to a closed-cell foam through which water cannot pass.

With the exception of the container state, all of the moldings of Okamoto are extrusions of filaments or films. And although Example 18

does not involve moldings, the foam described in Example 18 has the fibrous mesh structure of reticulated foam because it is water permeable and functions as a filter. In this way, the foam in Example 18 is similar to the non-woven fabrics made from the filaments in Examples 1-17. Okamoto teaches how to achieve the appropriate particle size that allows the active ingredient, a tea-extraction component, to retain its functional properties without being eluted from filters as the filaments that make up the filters are dipped or washed in water. Specifically, Okamoto describes how to prevent excessive clumping of the active ingredient caused by secondary flocculation. In fact, all of the figures of Okamoto are graphs showing particle size distribution of the tea-extraction component (A), the ceramics (C) and the talc (T). Okamoto teaches how to reduce the elution of the tea-extraction component (A) from the extruded filaments (moldings) from which non-woven fabric is prepared. *See* A185, col. 16:51-63. The elution of an active ingredient would never be a consideration with memory foam. Accordingly, Okamoto's foam is not memory foam.

> **3.    The Board's finding that Okamoto's "molded articles" can be used to make a memory foam mattress is factually incorrect because memory foam is not reticulated foam.**

The Board's decision evidently resulted from a semantic exercise of finding similar sounding words in Okamoto, Lin and the claims, as opposed

to from an understanding of the meaning of those words in the art of making foam for mattresses. The terms "molding composition" and "molded articles" were fabricated in order to force the two instances in which "polyurethane foam" is mentioned into the context of the polyurethane memory foam described in Lin and the other secondary references. However, Okamoto does not relate to memory foam. The one example of foam given in Okamoto relates to reticulated polyurethane foam, which is a fibrous mesh that can be used as a filter.

The findings that the fibers of the reticulated, open-celled polyurethane foam in Example 18 of Okamoto (i) correspond to the polyurethane memory foam described in Lin and (ii) are capable of being used as a layer of a mattress are factually incorrect. The finding that Okamoto's foam is structurally identical to memory foam is also factually incorrect. *See* A6, ll. 11-16. With the exception of the container state, the products formed by the moldings of Okamoto are all fabrics, nettings and meshes through which water and air can flow freely. Consequently, water and air flow freely through the polyurethane foam filter and cosmetic puff described in Example 18 of Okamoto. Foam through which water and air can flow freely is reticulated, open-celled foam that does not possess the resiliency of closed-cell foam that can be used for a mattress. One of

ordinary skill in the art of making a mattress would know that memory foam is not reticulated foam.

Hiroshi Okamoto and the other inventors of the Okamoto reference are affiliated with the Japanese company Erubu, the assignee of the Okamoto patent. Erubu makes filters. Erubu does not make mattresses or foam that can be used as a mattress. (See www.erubu.jp). As shown below, an internet image search for "reticulated polyurethane foam filter" returns the same types of reticulated foam that is commonly used in air filters.



The structure of reticulated foam is very different from that of closed-cell foam. The cell walls of reticulated foam have dissolved away, leaving only fibers to connect points around the peripheries of the former cells. As one of ordinary skill in the mattress arts would know, reticulated foam does not have a structure capable of being used to make a memory foam mattress. Reticulated foam does not have the air pockets that can support the weight of a person. A person lying on a layer of reticulated polyurethane foam would bottom out.

In summary, the Board's finding that Okamoto "teaches forming a wide range of molded articles including polyurethane foam articles" (A6, ll. 17-18) . . . "having a structure capable of being used as a layer of a mattress" (A5, ll. 11-12) is ***factually incorrect*** for numerous reasons.

## C. *The Board Committed Legal Error Under Graham v. John Deere in Affirming the Examiner's Rejection of Claims 21-27 and 31-41.*

The Examiner rejected independent claims 21 and 32 on obviousness grounds based on Okamoto's alleged teaching of green tea foam capable of being used in a mattress.  However, the Examiner's obviousness rejections were not supported by the factual findings required by *Graham v. John Deere*.  *Graham*, 383 U.S. at 17-18.  The Board committed legal error in its review of the Examiner's obviousness rejections by failing properly to perform the factual inquiries required under *Graham v. John Deere* to support the rejections.  Specifically, the Board failed to consider any evidence that would indicate what one of ordinary skill in the art of making a mattress would have considered to be the scope of Okamoto's Example 18. The relevant perspective is not that of a person of ordinary skill in the art of making filters.  The Board did not properly determine the scope and content of the Okamoto prior art because the Board failed to consider whether one of ordinary skill in the art of making a mattress would have determined that the reticulated, open-celled foam that was suitable for making the filter or cosmetic puff of Okamoto's Example 18 could also have been used to make

a memory foam mattress.  One of ordinary skill in the art of making a mattress would have known that reticulated, open-celled foam cannot be used to make a memory foam mattress.  Memory foam is not entirely open-celled, reticulated foam.  Reaching conclusions of law without first making the proper factual inquiries results in legal error, which is reviewed *de novo* by the Court of Appeals for the Federal Circuit.  *In re Gartside*, 203 F.3d at 1312.

Not only did the Board fail properly to perform the factual inquiries required by *Graham v. John Deere*, but it also failed to provide any articulated reasoning for its implicit assumption that the "polyurethane foam articles" of Okamoto have the same structure as the polyurethane memory foam of Lin. *See* A5, ll. 16-21; A6, ll. 13-18.  "[T]he Board must not only assure that the requisite findings are made, based on evidence of record, but must also explain the reasoning by which the findings are deemed to support the agency's conclusion."  *In re Lee*, 277 F.3d at 1344.  This Court cannot review the grounds upon which the Board actually relied because the terse 6-page decision does not reveal where the Board went wrong in its implied finding that foam suitable for making a filter has the identical structure as the memory foam used to make a mattress. *Applied Materials*, 692 F.3d at 1294; *In re Lee*, 277 F.3d at 1345-46.

## VI.    CONCLUSION

As a factual matter, Okamoto simply does not disclose a foam that is suitable for making a mattress.  All rejections of claims 21-27 and 31-41 depend on Okamoto disclosing such a foam.  Accordingly, all rejections of claims 21-27 and 31-41 are improper under *Graham v. John Deere* and should be reversed.

DATED: June 10, 2013                    Respectfully submitted,

/s/ Darien K. Wallace
Darien K. Wallace
T. Lester Wallace
IMPERIUM PATENT WORKS LLP
315 Ray Street
Pleasanton, CA 94566
(925) 550-5067
darien@imperiumpw.com
lester@imperiumpw.com

*Attorneys for Appellant*
*Zinus, Inc.*

# ADDENDUM



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 12/589,961 | 10/30/2009 | Suk Kan Oh | ZIN-007-1C | 9815 |

47713          7590          01/04/2013
IMPERIUM PATENT WORKS
P.O. BOX 607
Pleasanton, CA 94566

| EXAMINER |
|---|
| BOYLE, KARA BRADY |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1766 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 01/04/2013 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

**A1**

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

*Ex parte* SUK KAN OH

_____

Appeal 2011-010635
Application 12/589,961
Technology Center 1700

_____

Before CATHERINE Q. TIMM, MARK NAGUMO, and
DEBORAH KATZ, *Administrative Patent Judges*.


TIMM, *Administrative Patent Judge*.


DECISION ON APPEAL


STATEMENT OF CASE

Appellant appeals under 35 U.S.C. § 134 from the Examiner's decision to reject claims 21-27 and 31-41.  We have jurisdiction under 35 U.S.C. § 6(b).

We AFFIRM.

The claims are directed to a method of forming a foam mattress containing green tea.  Claim 21 is illustrative:

21.  A method comprising:

**A2**

Appeal 2011-010635
Application 12/589,961

       (a) mixing polyol raw materials together, wherein the polyol raw materials are used to make foam;

       (b) adding green dye to the polyol raw materials mixed together in (a);

       (c) adding green tea to the polyol raw materials mixed together in (a);

       (d) adding a catalyst to the polyol raw materials, the green tea [sic] dye and the green tea to make a green tea foam; and

       (e) making a foam layer of a mattress using the green tea foam.

(Claims App. at Br. 20.)

    The Examiner rejects, and Appellant appeals, the following rejections under 35 U.S.C. § 103(a):

A. The rejection of claims 21-27, 32, 35-37, 39, and 41 as obvious over Okamoto[1] in view of Lin[2];

B. The rejection of claims 31 and 38 over Okamoto in view of Lin, and further in view of O'Donnell[3];

C. The rejection of claims 32 and 33 over Okamoto in view of Lin, and further in view of Hochschild[4];

D. The rejection of claim 34 over Okamoto in view of Lin, further in view of Hochschild, and further in view of de Simone[5]; and

E. The rejection of claim 40 over Okamoto in view of Lin, and further in view of Dell'Accio[6].

---

[1] Okamoto et al., US 6,869,681 B2 patented Mar. 22, 2005.
[2] Lin et al., US 2007/0032561 A1 pub. Feb. 8, 2007.
[3] O'Donnell, US 5,484,195 patented Jan. 16, 1996.
[4] Hochschild, US 7,191,483 B2 patented Mar. 20, 2007.
[5] de Simone et al., US 5,610,207 patented Mar. 11, 1997.

**A3**

Appeal 2011-010635
Application 12/589,961

 In accordance with 37 C.F.R. § 41.37(c)(1)(vii), for each rejection we select a single claim as representative for resolving the issues on appeal unless Appellant argues a claim or group of claims separately.  For Rejection A, Appellant argues independent claims 21 and 32 together (Br. 6-13).  We select claim 21 as representative.  With regard to the dependent claims, Appellant argues claim 41 separately, but otherwise, relies upon the arguments presented against the independent claims (Br. 13-14).  Therefore, we consider claim 41 separately.  With regard to Rejections B and C, we select the claim argued by Appellant as representative, i.e., claims 31 and 32, respectively.

OPINION

 With regard to Rejection A, the issue on appeal with respect to representative claim 21 is:  Has Appellant identified a reversible error in the Examiner's finding that Okamoto in combination with Lin provide a reason to form the green tea molding composition of Okamoto into a foam layer capable of being used in a mattress?

 After review of Appellant's arguments (Br. 6-13; Reply Br. 4-10), and the evidence as a whole, we determine that Appellant has not identified such an error.

 Okamoto teaches forming articles, which the reference terms "functional moldings," from a resin composition having deodorizing and antimicrobial properties due to the presence of a functional component (A) that may be green tea (Okamoto, col. 1, ll. 9-15; col. 3, l. 60 to col. 4, l. 8; col. 4, l. 25).  The resin (R) to which the green tea can be added that can take a wide variety of forms including forming resins, painting resins,

---

[6] Dell'Accio, US 2008/0083069 A1 patented Apr. 10, 2008.

3

**A4**

Appeal 2011-010635
Application 12/589,961

coating resins, ink resins, sealing resins, and cosmetic resins (col. 8, ll. 43-56). The resins can be melt forming resins, solution forming resins or emulsion forming resins (col. 9, ll. 12-15). The chemical nature of the resin is also wide ranging and includes polyurethane resins (col. 9, ll. 21-62, particularly, col. 9, l. 24). The methods of forming the resins are also wide ranging (col. 9, ll. 17-20). Okamoto suggests a wide range of end uses including various types of moldings (col. 13, ll. 32-45).

Appellant's claim 21 recites a step of making a foam layer of a mattress (Claim 21, step (e)). Initially, we note that claim 21 is not directed to forming a mattress, but only making a foam layer. In terms of structure, the claim merely requires a foam layer having a structure capable of being used as a layer of a mattress. Given that the claim is not directed to forming a mattress, we agree with the Examiner that the use of the foam layer in a mattress is merely an intended use for the foam layer (Ans. 11). Claim 21 does not require that the foam layer actually be placed in a mattress.

Okamoto discloses forming a polyurethane foam article, i.e., a polyurethane foam article said to be suitable as, for example, a cosmetic puff and a filter (col. 23, ll. 37-49).

Lin teaches forming polyurethane memory foam into such products as mattresses, pillows, cushions of office chairs, etc. (Lin ¶¶ [0002] and [0029]).

Given the breath of resins to which the green tea component of Okamoto can be added and the disclosure of using it within a polyurethane foam article, we agree with the Examiner that a preponderance of the evidence supports a conclusion of obviousness. Combining the known green tea composition with polyurethane resin to form memory foam mattresses

**A5**

Appeal 2011-010635
Application 12/589,961

and layers associated with mattresses would have been merely the combination of known compositions and materials for their known benefits, i.e., the deodorizing and antimicrobial benefits of the green tea composition with the benefits of memory foam mattress material.

Appellant has not identified a reversible error in the Examiner's finding that Okamoto in combination with Lin provides a reason to form the green tea molding composition into a foam layer capable of being used in a mattress.

Claim 41 depends from claim 21 and recites "wherein the foam layer of the mattress is a layer of the mattress upon which a user directly rests."

The Examiner finds that this is a further intended use of the product of claim 21 and does not result in a structural difference between the claimed invention and the prior art (Ans. 6). Appellant disagrees because "the molding filaments of Okamoto are not structurally identical to the recited foam layer of a mattress upon which a user directly rests." (Br. 13.)

Appellant's contention is based upon a faulty reading of Okamoto. Okamoto is not limited to forming filaments, but teaches forming a wide range of molded articles including polyurethane foam articles. We cannot say that Appellant has identified a reversible error in the Examiner's rejection of claim 41.

With regard to the rejection of claims 31 and 38, Appellant focuses on claim 31, therefore, we do the same. Claim 31 depends from claim 21 and recites "wherein the foam layer is green colored, further comprising: (f) displaying the green-colored foam layer in a cut-away display sample of the mattress."

5                                                                      **A6**

Appeal 2011-010635
Application 12/589,961

Appellant contends that none of the references relied upon by the Examiner teaches coloring the foam, and the Examiner cannot rely upon Official Notice to supply the missing teaching (Br. 15). However, Appellant does not specifically traverse the well-known nature of coloring that which one desires to color with a colorant. Therefore, Appellant's argument is not persuasive.

Appellant's other arguments fail to address the specific combination made by the Examiner.

With regard to the rejection of claims 32 and 33, Appellant confines the arguments to claim 32. The relevant issues arising have already been addressed above. We are not persuaded of reversible error in the rejection.

With regard to the rejections of claims 34 and 40, Appellant does not address the specific rejections made by the Examiner. We cannot say that Appellant has identified a reversible error in either rejection.

## CONCLUSION

We sustain the Examiner's rejections.

## DECISION

The Examiner's decision is affirmed.

## TIME PERIOD FOR RESPONSE

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a)(1).

## AFFIRMED

sld

**A7**

# United States Court of Appeals
## for the Federal Circuit
IN RE SUK KAN OH, 2013-1321

### CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by IMPERIUM PATENT WORKS LLP, Attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **June 10, 2013**, Counsel for Appellant has authorized me to electronically file the foregoing **Brief for Appellant** with the clerk of court using the CM/ECF system, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

> Nathan K. Kelley, Deputy Solicitor
> Jamie Lynne Simpson
> United States Patent and Trademark Office
> Office of the Solicitor
> P.O. Box 1450
> Mail Stop 8
> Alexandria, VA 22213-1450
> (571) 272-9035
> nathan.kelley@uspto.gov
> jamie.simpson@uspto.gov
>
> *Attorneys for Appellee*

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

June 10, 2013                    /s/ Robyn Cocho
                                Counsel Press

## RULE 32(a)(7)(C) CERTIFICATE OF COMPLIANCE

I certify pursuant to Fed. R. App. P. 32(a)(7)(c), as modified by Fed.

Cir. R. 32(b), that the foregoing brief complies with the type-volume

limitation.  It was printed using a Times New Roman, 14 point

proportionally spaced font.  The total number of words in the foregoing brief,

excluding that table of contents and the table of authorities, the certificate of

interest, the statement of related cases, and this certificate of compliance, is

[6,443] words, as calculated by the Microsoft Word program.

/s/ Darien K. Wallace
Darien K. Wallace